IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO. 3:25-CR-00262-KDB-DCK

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**TIRON U. LYONS,**<br><br>**Defendant.** | **<u>MEMORANDUM AND ORDER</u>** |

**THIS MATTER** is before the Court on Defendant Tiron Lyons's Motion to Suppress (the "Motion") (Doc. No. 20). The Court has carefully considered this Motion, the Parties' briefs and exhibits, and hearing testimony and oral argument on the Motion from the Parties' counsel on August 13, 2026. For the reasons discussed at the hearing and below, the Court will **DENY** the Motion.

## I. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. However, rather than "proscrib[ing] all contact between the police and citizens," *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984), the Fourth Amendment "prevent[s] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Id.* (quoting *United States v. Martinez-Fuente*, 428 U.S. 543, 554 (1976)). The ultimate touchstone of the Court's analysis is whether a search is "reasonable under the circumstances." *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016) (citing *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

## II. FACTS AND PROCEDURAL HISTORY

On December 29, 2024, at 5:03 p.m., a "be on the lookout" ("BOLO") notification went out to the Charlotte-Mecklenburg Police Department ("CMPD") Central Division with the subject "Transit Center – New Crack Dealer." (Doc. No. 24-1). The email included three photos of an African American male holding narcotics and wearing dark clothes, a black jacket, and a crossbody bag. *See id.* Officer Jermaine Lewis ("Lewis") received the BOLO email while he was out on his patrol shift, which lasted that night into the early hours of the following day.

On December 30, 2024, at approximately 1:00 a.m., Lewis initiated a traffic stop on a vehicle driven by Brionne Smith ("Smith"). (Doc. No. 33 at 4:2-5) (Hearing Transcript, "Tr."). Lewis stopped the vehicle because he saw Smith was the driver and she was "known to [him] to not have a valid driver's license," which he confirmed during the stop. (Tr. 4:7-15). Lewis captured the entire encounter via his body-worn camera ("BWC").[1] *Id.* 4:25-5:6; Gov. Ex. 4. After stopping her car, Smith rolled down the window, and Officer Lewis opened the door and instructed her to step out. (Ex. 4, 01:10 a.m.). He explained that he pulled her over for changing lanes without signaling and operating a vehicle without a valid license. *Id.* Lewis observed an open wine bottle on the floor and suspected the liquid substance in a red plastic cup in Smith's lap was alcohol. [2] *Id.* 01:11 a.m.

[1] The BWC footage that was admitted into evidence is as follows: Officer Lewis's BWC, Exhibit 4; Officer Henderson's BWC, Exhibit 3. To create a clear timeline, the Court uses the timestamp in the BWC footage for each officer rather than the relative time of the video that has elapsed.

[2] The Court notes that after Lewis handcuffed Smith and attempted a pat down, he noticed she was wearing a crossbody bag. After examining the strap for clips to remove the bag, he realized he could not remove the crossbody bag. To effectuate a search, he was forced to remove one of Smith's handcuffs temporarily to allow the crossbody bag to drop from her person. (Ex. 4, 01:15 a.m.). Lewis placed Smith's crossbody bag on the hood of the patrol car and searched it for about ten seconds, finding mostly loose cash, deodorant, and a passport, then put it aside and returned to

Officer Lewis noticed that the person in the front passenger's seat looked like and was wearing similar clothes and a crossbody bag as the suspect identified in the BOLO email he received earlier in his shift. (Tr. 6:24-7:4; Ex. 4, 11:3:14). Lewis asked the man for his identification, which Defendant Lyons provided. *Id.* 01:11 a.m. Because he was alone and intended to detain two suspects, Lewis called for backup. *Id.* 6:1-11. Moments later, backup arrived: Officers Henderson, Lily, Hopper, and Thai. *Id.* 7:18-19.

Lewis directed Henderson and Hopper toward Lyons. Henderson asked Lyons to step out of the vehicle and place his hands behind his back, as was "common practice." (Tr. 38:5-7). Although he complained he was just getting a ride to the train station, Lyons was otherwise cooperative. Once handcuffed, Hopper walked Lyons to his patrol car, which was behind Smith's and Lewis's vehicles. Lewis instructed Henderson to review the BOLO email and indicated Lyons might be the suspect. (Ex. 4, 01:15 a.m.). Hopper remained with Lyons while Henderson went to look at the email.[3] (Ex. 3, 01:20 a.m.). Henderson reviewed the BOLO and agreed that the pictured suspect might be Lyons, who was wearing similar clothes and crossbody bag. (Tr. 40:6-15). Then Henderson approached Lyons and asked him for consent to search his person, but Lyons respectfully declined. *Id.* 41:17-21; Ex. 3, 01:22 a.m. So, she returned to Smith's vehicle to discuss the situation with Lewis. (Ex. 3, 01:23 a.m.).

---

pat down Smith. *Id.* at 01:18 a.m. Lewis eventually arrested Smith for driving without a license and with an open container. (Tr. 16:5-6).

[3] Henderson testified that she asked Officer Lily to confirm her finding because "It's always good to get a second opinion." (Tr. 39:6-7). The record does not reflect Lily's opinion, but Henderson testified that Lily told her that Lyons admitted to having just come from the transit center. (Tr. 40:16-20).

Lewis was searching the vehicle for drugs and alcohol when Henderson notified him of Lyons's refusal to consent to a search. She told Lewis that she "definitely" thought Lyons matched the BOLO pictures and was "pretty confident" he had something on him. (Ex. 3, 01:23 a.m.). Based on her training and experience, "those crossbody bags are often where people keep firearms and narcotics." (Tr. 42:3-8). Because she thought the BOLO photo match might be insufficient to search Lyons, she asked Lewis what evidence of probable cause he had for a search. Lewis told her he had observed a loose pill suspected narcotic on the passenger side door,[4] as well a green leafy shake substance on the passenger-side floor. (Ex. 3, 01:23 a.m.; Tr. 11:21-24, 12:5-7). Based on these observations Lewis concluded based on his "training and experience," the "green leafy substance" was marijuana, so the officers had probable cause to search him. (Ex. 3, 01:23 a.m.).

Lewis and Henderson moved to Hopper's cruiser and joined Hopper who had maintained control of the handcuffed Lyons. Lewis informed Lyons that they identified marijuana substance on the floor of the vehicle and that he was going to search him. Lyons argued that it was not his car and any weed in it was not his, and Lewis replied that the car smelled like marijuana. (Ex. 4, 01:25 a.m.). Then Lewis read Lyons his *Miranda* rights. (Ex. 4, 01:24 a.m.; Tr. 12:23-13:16).

Just as he began to look through Lyons's pockets, Lewis asked Lyons whether he had anything on him, and Lyons admitted he had marijuana in his right pocket. *Id.* at 01:25 a.m. At that point, Hopper took over the search, and Lewis held Lyons's hands and arm. (Ex. 4, 01:25 a.m.; Tr. 14-1:7). Hopper unclipped Lyons's crossbody bag and placed it on the hood of the patrol car and then continued to search Lyons's. (Ex. 4, 01:27 a.m.).

---

[4] Although Lewis testified that he "suspected [the pill] to be MDMA," he admitted it was "not tested" but should be in evidence. (Tr. at 28:18-22).

While Hopper was searching Lyons, Henderson began searching the crossbody bag. (Ex. 4, 01:27 a.m.; Ex. 3). Henderson searched the crossbody bag on the hood of the patrol car approximately three feet from Hopper and Lyons, and there were at least three other CMPD officers within ten feet during the search. (Tr. 43:13-19; 50:4-5). Within the first ten seconds, Henderson pulled out two baggies of narcotics and a scale, and in approximately thirty seconds she found a firearm.[5] (Ex. 3, 01:28 a.m.). Lyons was charged with one count of Felon in possession of a firearm, and this Motion followed.

## III. DISCUSSION

Defendant contends that the officers' search violated his Fourth Amendment rights and that the evidence obtained from it should be suppressed under the exclusionary rule. More specifically, Defendant argues that the search (1) exceeded the scope of a reasonable suspicion *Terry* frisk under *Terry v. Ohio*, 392 U.S. 1 (1968), and (2) the search incident to arrest exception to the warrant requirement does not apply.[6] *See* Doc. Nos. 20, 36.

### A. The Traffic Stop and Search of the Vehicle

Defendant moves to suppress evidence obtained from his crossbody bag after the traffic stop because law enforcement officers allegedly conducted a search that exceeded the scope of a *Terry* frisk. (Doc. No. 20 at 3.) The Court disagrees.

---

[5] Henderson later relayed the serial number to dispatch, which ran a search that revealed the firearm was stolen. (Tr. 45:12-46:5).

[6] In addition to opposing the Motion on these grounds, the Government contends the Motion should be denied under the inevitable discovery doctrine, which Defendant opposes. (Doc. No. 24 at 9-10, Doc. No. 36). However, the Court can and will resolve the Motion without applying this doctrine, so it need not be considered further.

### 1. Reasonable Suspicion to Seize a Vehicle and Passengers

Lyons was seized within the meaning of the Fourth Amendment when the traffic stop commenced, so the Court begins its analysis with the stop. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment and [therefore] must be reasonable under the circumstances." *Palmer*, 820 F.3d at 648 (citing *Prouse*, 440 U.S. at 653-54); *see also Brendlin v. California*, 551 U.S. 249, 251 (2007) (holding a passenger is seized too). The seizure begins when the vehicle is stopped by police and ends when the police "have no further need to control the scene and inform the driver and passengers they are free to leave." *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). A traffic stop only requires reasonable suspicion, "a less demanding standard than probable cause," and means officers need "at least a minimal level of objective justification for making the stop." *United States v. Critchfield*, 81 F.4th 390, 393 (4th Cir. 2023) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In short, the officer's rationale must be "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at 27) (internal quotations omitted).

To review the constitutionality of a traffic stop, courts use the two-prong standard from *Terry v. Ohio*, 392 U.S. 1 (1968). First, the Court must determine "whether the articulated bases for the traffic stop were legitimate." *Palmer*, 820 F.3d at 648. This is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id.* at 648 (quoting *Johnson*, 555 U.S. at 327). Second, the Court assesses "whether the actions of the authorities during the traffic stop were 'reasonably related in scope' to the bases for the seizure." *Id.* at 649. Importantly, an officer may not "investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent *or develops reasonable, articulable*

*suspicion of ongoing criminal activity*." *Id.* at 649-50 (quoting *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011)) (emphasis added).

Here, both *Terry* prongs are met. First, Lewis testified that he "knew" that Smith was driving without a valid license. *Id.* 4:7-15. Evidence in the record, specifically the BWC from Lewis and others, makes clear this was more than a naked hunch. Lewis can be heard saying that he had run into Smith five times before and that he had previously arrested her and impounded her vehicle for driving with an invalid license. (Ex. 4, 01:18 a.m.). Further, it appears that Lewis may have "known" Smith was without a valid license because he was still in possession of it.[7] The question is whether this "knowledge" is a sufficiently "objective justification for making the stop," *Critchfield*, 81 F.4th at 393. In other words, is the bases for the stop "legitimate." *Palmer*, 820 F.3d at 648. The Court finds that it is. Lewis's recent experience with Smith for the same infraction hardens the grounds for his reasonable suspicion to more than an "inchoate and unparticularized suspicion or hunch."[8] *Burton*, 228 F.3d at 527.

*Terry*'s second prong is likewise satisfied. Lewis's initial investigation was to obtain Smith and Lyons's driver's licenses, which was "'reasonably related in scope' to the bases for the seizure." *Palmer*, 820 F.3d at 649. When Lewis opened Smith's door, a bottle of wine was readily visible by her seat, and Lewis could also smell alcohol and marijuana. (Ex. 4, 01:11 a.m.; Tr. at

[7] At the beginning of the traffic stop, when Lewis obtained Lyons's identification, Smith can be heard telling Lewis that he already had hers, likely in connection with the previous arrest. (Ex. 4, 01:11 a.m.).

[8] To be sure, Lewis could not have actually "known" that Smith did not have a valid license at the time of the traffic stop as this assumes that Smith had not obtained a valid license since her last arrest. But this is not a large, logical leap. The first step in their interaction confirmed Lewis's suspicion because rather than flash a newly minted identification, she suggested that he already had her ID. *See supra* n.8.

13:1-10).[9] This development allowed Lewis to expand the scope of his traffic stop to include a search of the vehicle. *Palmer*, 820 at 649-50. Also, the fact that the traffic stop was directed at Smith, not Lyons, does not save him. *Brendlin*, 551 U.S. at 251. Lyons chose his means of transportation while carrying the items he possessed. Therefore, the Court finds that both *Terry* prongs are met, and the smell of marijuana alone authorized Lewis to search the vehicle.

**2. Probable Cause to Search the Vehicle**

An officer may extend a traffic stop based only on reasonable suspicion, but more is required to conduct a search: an officer may only search the vehicle if "he obtains consent, secures a warrant, *or develops probable cause to believe the vehicle contains evidence of criminal activity*." *Palmer*, 820 F.3d at 650 (citing *United States v. Baker*, 71 F.3d 313, 319 (4th Cir. 2013)) (emphasis added). Probable cause exists "when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Davis*, 997 F.3d 191, 201 (4th Cir. 2021) (quoting *United States v. Patiutka*, 804 F.3d 684, 690 (4th Cir. 2015)).

It is well settled that under *Terry* officers may remove the driver and passengers from vehicles during routine traffic stops. *See United States v. Sakyi*, 160 F.3d 164, 167 (4th Cir. 1998) (first citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (drivers); then citing *Maryland v. Wilson*, 519 U.S. 408 (1997) (passengers)). However, because a frisk or "pat-down" is "substantially more intrusive than an order to exit a vehicle," an officer needs more justification than the reason for the traffic stop to frisk a passenger. *Sakyi*, 160 F.3d at 169. Such a suspicion may be satisfied when an

[9] Lewis further observed a red plastic cup in Smith's lap, which Smith argued was water. *Id.* at 29:17-23. Although Lewis responded that it was alcohol, he poured it out and quickly stacked the cup in the driver's door with others. The liquid was thus not tested. In any event, whether or not there was alcohol in the cup, there was ample other probable cause to search the vehicle.

officer has objectively reasonable suspicion that drugs are present, and when the suspicion is "not readily attributable to any particular person in the vehicle, it is reasonable to conclude that all occupants of the vehicle are suspect." *Id.* Further, because guns and drugs often go together, a pat-down of a passenger for drugs and weapons upon exiting a vehicle is permissible. *See Sakyi*, 160 F.3d at 169; *see also United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (citing *Sakyi* favorably). *United States v. Perrin*, 45 F.3d 869, 873 (4th Cir. 1995) (describing an officer's belief as reasonable that a person dealing drugs was also carrying had a weapon).

Here, quickly after opening the vehicle's door, Lewis observed open containers of alcohol and detected the odor of marijuana coming from the vehicle. This alone gave Lewis probable cause to search the vehicle for drugs. *Davis*, 997 F.3d at 201 ("An officer's detection of marijuana odor is sufficient to establish such probable cause.") Further, because traffic stops are "especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), and there was probable cause to search, *Palmer*, 820 F.3d at 650, Officer Lewis was well within his authority to remove Smith and Lyons from the vehicle and conduct the search under safer circumstances. (citations omitted). During his search, Lewis found a suspected narcotics pill and "green leafy substance" on the passenger floor. This, combined with the odor, provided Lewis probable cause to search Lyons for drugs. Of course, just after Lewis found the marijuana on the floor, Henderson returned and confirmed the BOLO photos were Lyons. All this taken together provided Lewis with ample probable cause to search Lyons.

**3. Miranda and Further Probable Cause to Search Lyons**

Moreover, the Defendant overlooks a key verbal exchange: Lewis *Mirandized* Lyons, and Lyons admitted to possession of marijuana prior to the search. (Ex. 4, 01:24 a.m.; Tr. 12:23-13:16). While Lyons contends that the search exceeded a *Terry* stop because the officers "immediately

went into his pockets and began pulling items out," (Doc. No. 20 at 3), he does not argue (nor could he) that he was improperly *Mirandized* or that his subsequent confession was coerced or otherwise invalid. In other words, Lyons could not at that point have denied consent to search because any doubt that he was then presently committing a crime was removed by his admission. And significantly, when he confessed to possession and during the initial part of the search of him Lyons was still wearing the crossbody bag. That is, it was an item—whether it was considered part of clothing or a container—that was within his immediate control.[10] Accordingly, Officers Lewis and Hopper had sufficient probable cause to search his person, pockets, and crossbody bag.

In sum, the sequence of investigation and searches progressed in a logical and lawful manner: Lewis's traffic stop was based on articulable suspicion that Smith was operating the vehicle without a license; the scope of the *Terry* stop appropriately expanded when probable cause of marijuana use or possession developed; the search of the vehicle yielded further evidence of such a crime; the BOLO photo confirmation connected Lyons to a potential "New Crack Dealer;" and Lyons post-*Miranda* confession to possession cemented Lewis's probable cause to search his person.

### B. Search Incident to Arrest

#### 1. Legal Framework

"'A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions' to the Fourth Amendment's warrant requirement." *Davis*, 997 F.3d at 195 (quoting *United States v. Ferebee*, 957 F.3d 406, 418 (4th Cir. 2020)). One such exception authorizes searches incident to arrest. *See id.* (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)). The search-incident-to-arrest exception authorizes "arresting officers to search both 'the

[10] *See infra* Part B.1.

arrestee's person and the area within his immediate control.'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (internal quotation omitted). This includes closed containers, which officers may remove from defendant "thereby alleviating their safety concerns, before they conduct the search." *United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (citing *United States v. Han*, 74 F.3d 537, 542 (4th Cir. 1996)) (describing geographic and temporal limits on search incident to arrest as items within arrestee's "immediate control" and "substantially contemporaneous").

Probable cause is sufficient to support a search incident to arrest: the arrest need not occur before the search, and the officer need not have the subjective intent to make the arrest. *See Han*, 74 F.3d at 541 (explaining the test for probable cause is objective, so an officer's "subjective state of mind is irrelevant"); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). "A search may be incident to a subsequent arrest if the officers have probable cause to arrest before the search." *Id.* (citing *Rawlings v. Kentucky,* 448 U.S. 98, 111 (1980)); *see also United States v. Radcliffe*, 757 F. App'x 250, 253 (4th Cir. 2018) (affirming denial of suppression motion when officer had probable cause to arrest suspect for possession of marijuana and the search that preceded the arrest discovered a firearm).

The Supreme Court emphasized that the two-fold purpose of this exception is to (1) "remove any weapons" available to "resist arrest or effect [] escape," and (2) "prevent the concealment or destruction of evidence." *Id.* (quoting *Chimel*, 395 U.S. at 763 (finding "ample justification . . . for a search of the arrestee's person and the area within his immediate control"). The Supreme Court applied the "twin rationales of *Chimel*" to permit searches of vehicles incident to arrest "only when the arrestee is unsecured and within reaching distance of a passenger

compartment at the time of the search." *Arizona v. Gant*, 556 U.S. 332, 343 (2009). In *Davis*, the Fourth Circuit reasoned that the Supreme Court's rationale in *Gant* was anchored in *Chimel*, a non-vehicle case, and applied *Gant* to "non-vehicular containers." It held that officers may conduct warrantless searches of non-vehicular containers incident to lawful arrest "only when the arrestee is unsecured and within reaching distance of the container at the time of the search."[11] *Davis*, 997 F.3d at 197 (quoting *Gant*, 556 U.S. at 343).

**2. The Crossbody Bag Search**

Accordingly, the inquiry before the Court is whether it was reasonable for the officers to believe that the Lyons "could access his backpack *at the time of the search*." *Id*. Lyons argues that the facts of this case are "analogous" to the facts in *Davis*, which the Court should use as the "principal guidance" to decide whether to suppress the evidence obtained from Lyons's bag. (Doc. No. 36 at 1.) According to Lyons, the holding in *Davis*, together with *Chimel* and *Gant*, renders the search unconstitutional because when the officers searched the crossbody bag, Lyons was secured and unable to reach it. *Id.* at 2. Lyons also argues that not only was he not under arrest when the officers searched him, but also that Lewis testified that he would not have arrested Lyons just for personal-use amount of marijuana. (Doc. No. 36 at 5; Tr. 21:5-7).

The Government contends that the search incident to arrest may occur prior to the formal arrest and the subjective intent of the arresting officers is irrelevant because the objective evidence—marijuana odor, shake on passenger floor, and post-Miranda confession to

[11] The Fourth Circuit noted that it "remains an open question" whether the *Gant* inquiry amounts to a "two-factor test, both aspects of which the government must satisfy" or is "more akin to a sliding scale with two dimensions for evaluating the reasonableness of the officer's belief that the arrestee could access the container so as to retrieve a weapon or destroy evidence." *Davis*, 997 F.3d at 198 n.6. As the Fourth Circuit held in *Davis*, the search here would be upheld under either interpretation.

possession—was sufficient to establish probable cause. Further, the Government argues that *Davis* is distinguishable because Lewis and others could reasonably have believed that Lyons could access his crossbody bag at the time it was being searched. (Doc. No. 24 at 7). The Government paints the scene as follows: Lyons stood next to the cruiser where the bag sat on its hood; Lyons remained on his feet within arm's reach; although handcuffed, Lyons could still walk around; and the officer that stood behind Lyons holding him, Hopper, was significantly smaller than Lyons. *Id.* at 7-8. Henderson testified that such crossbody bags are "often where people keep firearms and narcotics" because they are "easily accessible." *Id.*; Tr. at 42:5-6; 56:22-24. Lastly, the Government contends that Lyons's crossbody bag was the same bag observed at the transit center on the drug trafficking suspect captured in the BOLO email. (Doc. No. 35 at 10).

The Government is correct that the sequence of the search incident to arrest and subjective intent of Lewis do not matter. *See Han*, 74 F.3d at 541; *Rawlings*, 448 U.S. at 111. Probable cause is sufficient to conduct a search incident to arrest. *See Radcliffe*, 757 F. App'x at 253. And because the search occurred "substantially contemporaneous with the arrest," the arrest may follow on the heels of a valid search. *Currence*, 446 F.3d at 557. Moreover, Lewis's subjective intent plays "no role" in the Court's probable cause analysis. *See Whren*, 517 U.S. at 813. Lewis had probable cause to arrest Lyons for possession of marijuana and therefore the authority to search him "without any additional justification." *United States v. Alston*, 494 F. App'x 408, 411 (4th Cir. 2012) (citing *Robinson*, 414 U.S. at 235).

As to the relevance of *Davis*, both Parties gloss over an important distinction: Lyons was wearing the crossbody bag. Accordingly, there are two parts to the Court's analysis to apply and distinguish *Davis*: (1) the surrounding circumstances of the search; and (2) the location of the crossbody bag when the search began.

#### a. The Circumstances of the Search

As for the relevance of *Davis*, Lyons is correct that it is an important precedent that the Court must consider; however, the Court ultimately agrees with the Government that the facts are distinguishable, and the *Davis* analysis cuts in the Government's favor.

In *Davis*, a routine traffic stop for tinted windows developed quickly into a vehicular chase followed by a foot chase. About three minutes into the traffic stop, Davis drove off. After a high-speed chase, they reached a cul-de-sac, and Davis dismounted and continued fleeing on foot carrying a backpack. After getting stuck in a swamp, Davis acquiesced, returned to dry land, dropped his backpack, and lay down on his stomach. *See Davis*, 997 F.3d at 193-94. After a pat down that revealed a large amount of cash, the officer handcuffed Davis's hands behind his back and placed him under arrest. Then the officer unzipped the closed backpack and found money and drugs. *Id.* Davis sought to suppress the evidence from the backpack. The Fourth Circuit agreed, holding that the backpack search was unlawful because there was "no doubt that Davis was secured and not within reaching distance of his backpack" when it was searched. *Id.* at 198. The court listed several factors that gave them "no difficulty" in finding he was secured: Davis was (i) lying face down, (ii) handcuffed behind his back, (iii) previously ordered out of the swamp at gun point, (iv) only around officers who were nearby, (v) surrounded and outnumbered three to one, and (vi) in a neighborhood without other distractions enabling officers to focus solely on him. *Id.* The court explained that although the bag was close by, the distance Davis could reach was "severely curtail[ed]" and he had "severely restrained mobility." *Id.* (declining to "recount the various acrobatic maneuvers Davis would have needed to perform" to reach the bag).

There are some similarities between Lyons and the defendant in *Davis*. To be sure, the circumstances leading up to the arrest were different in ways that are favorable to Lyons. The arrest

in *Davis* was preceded by a traffic stop, high-speed chase, foot race, and the officer only secured the defendant after the defendant got stuck in knee-high water in swampy terrain after the officer held him at gunpoint. The only complaint about Lyons was that he was "overly cooperative." [12] (Tr. at 24-26). It is also true that Lyons was handcuffed and outnumbered by police officers. Hopper and Lewis took turns holding Lyons's hands and arms while the other searched his pockets, and Henderson was searching the crossbody bag a few feet away on the hood of the patrol car. And like *Davis*, Lyons was unlikely to physically obtain control of the crossbody bag. Indeed, Lewis testified that it would have been impossible for Lyons to physically grab the bag. (Doc. No. 36 at 5; Tr. at 20-21). Further, the video evidence makes clear that Lyons was cooperative with the officers, reducing the likelihood of a physical altercation.

However, on balance, these similarities and defense-favorable facts do not outweigh the differences that require the Court to deny Defendant's Motion. Although Lyons was outnumbered by officers, the officers were also attending to Smith, whereas there were no other suspects in *Davis*, and the officers could focus "solely" on him. Similarly, the scene in *Davis* was a quiet neighborhood, so the officers were not distracted, but with Lyons, the arrests occurred in downtown Charlotte. *See Davis*, 997 F.3d at 200 (acknowledging "officers must not only maintain custody of the arrestee but also stay vigilant of the crowd and any efforts by confederates to interfere with the arrest"). And, although Lyons could not just walk around like the defendant in *Ferebee*, he was less secure than the defendant in *Davis*. *Compare Davis*, 997 F.3d at 198 ("[The handcuffed and face-down Davis had severely restrained mobility and was not within reaching distance of the backpack next to him.") *with Ferebee*, 957 F.3d at 419 ("[Ferebee] was only a few

[12] The Court notes, however, that Lewis's testimony was that Lyons was "overly cooperative" to the point of being suspicious. *See* Tr. at 24-26.

steps away from the backpack. He was handcuffed, but he could still walk around somewhat freely and could easily have made a break for the backpack inside the house.")

Therefore, under a straightforward application of all the circumstances in *Davis*, the facts related to the search of Lyons's crossbody bag are distinguishable from *Davis* and lawful under "the search incident to arrest" test *Davis* provides.

**b. The Location of the Crossbody Bag**

Another factor leading to the conclusion to deny the Motion is a key distinction the Parties gloss over: unlike *Davis*, the officers here initiated the search while Lyons was still wearing the crossbody bag.

Unlike the defendant in *Davis*, Lyons did not drop his bag away from his body before the police officer handcuffed and searched him. Instead, Lyons was wearing the crossbody bag during the traffic stop; he was wearing the crossbody bag when he exited the vehicle and was handcuffed; he was wearing the crossbody bag when he was *Mirandized* and confessed to possession; and, critically, he was wearing the crossbody bag when Lewis initiated the search of his person. Again, the relevant inquiry is whether the bag is within the reach of the defendant *at the time of the search*. So, first, it is necessary to ask: when precisely did this search begin? This initial inquiry is crucial and, in this case, dispositive.

Lewis approached Lyons after developing probable cause based on the green leafy substance on the passenger floor and Lewis and Henderson suspected Lyons matched the picture in the BOLO email. Then, after Lewis *Mirandized* Lyons, Lyons admitted to possessing marijuana. At that point Lewis had ample probable cause to search to see if Lyons had physical possession of more marijuana, not just the suspected marijuana in the vehicle. This probable cause supported searching Lyons's person, and at that time Lyons was wearing the crossbody bag. So, when the

search began, the bag could have not only contained evidence of his possession of marijuana, but it also was within his immediate control. This is fundamentally different than *Davis*.

Moreover, Lewis was of course not required to search the crossbody bag while it was attached to Lyons. This would increase the risk of harm to the officer. While it is more difficult to imagine Lyons reaching the crossbody bag *after* it was removed and placed on the patrol car, it does not require much imagination to picture a physical altercation unfolding if Lewis was required to stand face-to-face with Lyons, close enough to visually inspect the inside of the crossbody bag. For one thing, the ability to inspect inside the bag would be diminished, especially when compared with laying it on an unobstructed surface like the hood of the patrol car. For another, Lewis would be within striking distance of a shoulder-check or headbutt. If Lyons had simply fallen or lunged forward or resisted and caused the officers to push him forward onto the patrol car, the firearm could have discharged. The Fourth Amendment does not require officers to conduct their search in such a way, nor does removing the bag from Lyons, as it must be to undertake the permitted search safely, sever the authorization to search the bag.

A district court in this Circuit has agreed with this analysis, and the Fourth Circuit approved of the distinction. *See United Staes v. Johnson* No. 3:21-cr-29, 2022 WL 2373700 (E.D. Va. June 30, 2022) (distinguishing *Davis* and holding search of crossbody bag lawful under the search incident to arrest exception when it was on the defendant's chest when the search commenced), *aff'd sub nom. United States v. Miffin*, No. 23-4040, 2024 WL 4888978, *8 (4th Cir. Aug. 23, 2024) (Diaz, C.J.) (unpublished opinion) (approving distinction from *Davis* where "critical differences" existed such as level of threat, "the indisputable nexus between drugs and guns," that the bag "remained on his person," and he could walk around somewhat freely). In *Johnson*, the district court highlighted that where an officer searches an arrestee's person, he may conduct a full

search of his person and personal items in his possession and control. *Johnson*, 2022 WL 2373700 at *18 (citing *Alston*, 494 F. App'x at 411). Further, this applies to containers or objects capable of holding another object. *Id.* (citing *Robinson*, 414 U.S. at 235).

The district court in *Johnson* emphasized that the "key distinction" is:

> "the officers in *Davis* could have moved the defendant himself and left the bag alone. The same cannot be said here, where the cross-body bag rested across Johnson's body. Johnson himself could not move without the bag moving with him, and it could not be removed without the handcuffs being taken off. Even if Officer Broaddus cut the strap, the bag likely would have to remain in police custody or be searched for safety reasons once removed. For instance, it could have contained a gun or other weapon capable of discharging or otherwise harming an officer if mishandled. This Court must find that, even if the bag were removed, a reasonable officer would have believed that it presented a threat to police officer safety.[13]

*Id.* at *19 (citing *United States v. Kithcart*, 34 F. App'x 872, 873 (3d Cir. 2002) (characterizing a fanny pack as "outer clothing" that can be searched)).

In sum, Officers Lewis, Hopper, and Henderson conducted a safe and secure investigation: they isolated Lyons away from Smith, they secured Lyons; they read him his *Miranda* rights and then obtained a confession; they then lawfully searched his person; and, continuing that search, removed his crossbody bag that, based on their training and experience often held firearms and narcotics, and they searched it for their safety and to determine if it held relevant evidence.

Accordingly, for all these reasons, Defendant's Motion to Suppress will be **DENIED**.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

---

[13] The *Johnson* court also properly noted that the officers ultimately had to cut the bag off Johnson but stated that this step is neither persuasive that the search was invalid nor a good policy to require such conduct. *See id*. ("But the destruction of an arrestee's property can hardly be a workable solution to every search of a bag draped around one's shoulder. In any event, the bag likely would have to remain in police custody, even if cut off, further emphasizing the need to eventually search the bag for safety purposes.").

Defendant's Motion to Suppress (Doc. No. 20) is **DENIED.**

**SO ORDERED ADJUDGED AND DECREED**.

Signed: October 5, 2026

Kenneth D. Bell
United States District Judge